

**SIGNED this 18 day of September, 2008.**

_____
John C. Cook
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT FOR
### THE EASTERN DISTRICT OF TENNESSEE
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| **DEBBIE LYNN VIVA** | ) | No. 07-12156 |
| | ) | **Chapter 7** |
| Debtor | ) | |
| | ) | |
| | ) | |
| **CAPITAL ONE AUTO FINANCE** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adv. No. 08-1026 |
| | ) | |
| **DEBBIE LYNN VIVA** | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

### M E M O R A N D U M

    This proceeding is before the court on the plaintiff's complaint seeking a declaration that

the obligation owed by the defendant debtor to the plaintiff is nondischargeable under the provi-

sions set forth in 11 U.S.C. § 523(a)(2)(A). Specifically, the plaintiff, Capital One Auto Finance ("Capital One"), contends that the defendant committed fraud against it through the misuse of a blank check financing program offered by the plaintiff to finance the purchase of automobiles by consumers. The defendant denies any fraud and claims that she followed all of the plaintiff's instructions in using the blank check program. Having considered the evidence presented in this case, and having considered the trial briefs and arguments of the parties, the court now makes its findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## I.

The plaintiff offers via the internet a "blank check" program that permits consumers to apply online for automobile financing. Upon approval of an online loan application, the borrower is sent a booklet that contains a note and security agreement, an attached blank check drawn on Capital One's account (detachable from the booklet only by tearing across perforations), instructions to both the borrower and participating dealer regarding the use of the check, a list of preferred dealers who participate in the program, and certain disclosures required by the Truth-in-Lending Act. To purchase a vehicle financed by Capital One, the buyer is instructed to deliver the booklet, with the blank check attached, to an approved dealer.  The booklet in turn instructs the dealer to verify that the customer requirements have been met, by contacting Capital One through an internet address or by telephone. The dealer is also instructed to ensure that the vehicle to be purchased meets certain requirements, that all requisite sales documents have been executed, that Capital One will be listed as the first and only lienholder on the eventual certifi-

cate of title, and that the borrower will be named as the only registered owner. Once these requirements are completed, the buyer uses the blank check to pay the dealer for the automobile.

The note and security agreement, which are part of the booklet, contain the following statements with respect to the borrower:

> By signing and negotiating the check enclosed, you agree to and acknowledge receipt of: the terms and conditions of the disclosure statement above; the terms and conditions of this note and security agreement as shown above and on the reverse side of this document; and a copy of the enclosed check as endorsed and negotiated by you.

> You agree to immediately cause Capital One to be named as the only lienholder on any certificate of title relating to the vehicle and that Capital One may hold the certificate of title until all amounts owed under this Agreement are paid.

> You agree that only you will be listed as owner on the vehicle title and registration and you further agree to keep the vehicle free of all liens and taxes and not to use the vehicle or permit the vehicle to be used improperly, illegally, for commercial use or for hire, or by a third party.

Above the perforated edge of the check is the following statement:

> Attention Dealer: See reverse and the following Dealer Requirements for instructions on accepting this check. This check to be detached by selling dealer only. All blank spaces must be completed for negotiation of this check.

The dealer requirements are set forth on the next page of the booklet below the perforated edge of the check. On the back of the check itself in small print is an Endorsement Agreement that reads:

3

>Dealer agrees (1) that payment of this draft is conditioned upon satisfaction of all Requirements (bearing the draft number) attached to this draft, and incorporated herein; (2) that dealer/existing lienholder has received payment in full for both the vehicle purchased with this draft and any related lien filing fees; (3) that the dealer and/or existing lien holder will cause Capital One Auto Finance, Inc. to be listed as the only legal lienholder on the certificate of title within 20 days of the date of sale; and (4) that only the signatory(ies) on the reverse side hereof shall be listed as the registered owner(s) of the vehicle.[1]

Prior to the transaction in question, the defendant had purchased several other vehicles using Capital One's blank check program, and she was familiar with the instructions for purchasing a vehicle through this program. In May 2006, the defendant decided to purchase a 2007 Chevrolet Avalanche from Edd Kirby Chevrolet in Dalton, Georgia, for $45,115.84. The circumstances surrounding that sale are very much in dispute.

According to Theodore Mader, the general manager at Edd Kirby Chevrolet, the defendant, accompanied by her employee, Kevin Burke, came to the dealership on May 31, 2006, to purchase the Chevrolet Avalanche. The defendant had been to the dealership previously and had already decided to buy the Avalanche. Mr. Mader testified that the defendant told both him and salesman Pete Flammini that she was purchasing the vehicle for use in her business, Rick Honeycutt Sports, and that she wanted the vehicle to be listed in the name of Kevin Burke. To protect her interest in the vehicle, she explained, she wanted to be listed as the only lienholder on

---

[1] The endorsement language above is from a sample booklet that was introduced into evidence by the plaintiff to explain the blank check financing program. It is quoted because the actual endorsement language on the copy of the check at issue in this proceeding is unreadable due to the presence of a stamp over the endorsement and the poor quality of the copy. While the endorsement language on the sample check differs slightly from the endorsement language on the check at issue in this proceeding, the evidence suggested that the substance of the endorsement language was the same.

the vehicle. A handwritten note from the dealership file confirmed this testimony and stated that Kevin Burke was to be the registered owner and that the defendant was to be the lienholder. All the necessary purchase documents were signed by Kevin Burke as the purchaser of the vehicle, none were signed by the defendant, and an application for certificate of title was completed that showed Kevin Burke as registered owner of the vehicle and the defendant as the lienholder. These instructions by the defendant were honored because, according to Mr. Mader, the defendant presented no blank check or Capital One booklet, but instead promised to pay for the vehicle by a check to be sent in the next day. Mr. Mader's testimony on this point is corroborated by a handwritten notation on the purchase checklist kept by the dealership, which states: "will overnight check." Upon this arrangement, the defendant and Kevin Burke were allowed to take immediate possession of the vehicle. Mr. Mader testified that he was familiar with Rick Honeycutt Sports, owned by Rick Honeycutt, a former major league baseball player, and that therefore he had no concern about receiving payment as the defendant had promised.

The check that Edd Kirby Chevrolet ultimately received from the defendant was a check from Capital One's blank check program. The check was made payable to Edd Kirby Chevrolet in the amount of $45,115.84, dated June 20, 2006, and was signed by the defendant. According to Margaret King, billing clerk for Edd Kirby Chevrolet, she received the check on June 20, 2006. Although she could not remember whether the check was delivered to her or received in the mail, she testified that it was not attached to any booklet. She processed the check as a cash payment and did not read the small-print endorsement agreement on the back of the check. Thereafter, a certificate of title was issued by the State of Tennessee showing Kevin Burke as the owner of the Chevrolet Avalanche and the defendant as the only lienholder.

5

The defendant's account of the sales transaction differed considerably from the account presented by Mr. Mader. According to the defendant, she appeared with Kevin Burke at Edd Kirby Chevrolet on May 31, 2006, for the purpose of purchasing the Chevrolet Avalanche. She testified that she presented the Capital One booklet, which included the customer and dealer requirements for closing the transaction, complete with the attached blank check. She further testified that salesman Pete Flammini followed the instructions in the booklet by calling Capital One to verify the defendant's identity and making a copy of her driver's license. She further testified that she requested that Kevin Burke, her employee and a personal friend of the family, be listed on the registration as a second driver because he would be driving the vehicle and she needed his name on the registration for insurance purposes. She denied requesting that she be listed as a lienholder on the vehicle. She also testified that she signed the blank check that was in the booklet as payment for the vehicle, and only after signing the check did she and Mr. Burke leave with the vehicle on May 31, 2006. The defendant had no explanation why Mr. Burke was listed as sole owner of the vehicle on the certificate of title, why she was listed as lienholder on the vehicle, or why the check that was used to purchase the vehicle was dated and processed on June 20, 2006, rather than on May 31, 2006.

When the defendant later filed her bankruptcy petition under chapter 7, she filed a statement of intention indicating that she planned to keep the vehicle by reaffirming the debt owed to Capital One. She testified that she learned for the first time after filing bankruptcy that she had been listed as lienholder on the certificate of title and that Kevin Burke had been listed as sole owner of the vehicle. Because Capital One did not have a perfected security interest in the vehicle, the chapter 7 trustee planned to sell the vehicle for the benefit of the debtor's estate. In

6

order to keep the vehicle, the defendant converted her case to chapter 13. Her chapter 13 plan proposes to pay unsecured creditors at least the value that they would have received had the debtor's estate been liquidated in chapter 7. Capital One, as an unsecured creditor, will receive its pro rata share of the chapter 13 distribution, but that distribution will be approximately 10% of what is owed to Capital One arising from the defendant's use of Capital One's blank check to buy the Chevrolet Avalanche.

In attempting to resolve the inconsistency between the testimony of Mr. Mader and the defendant, the court finds that Mr. Mader's testimony to be more credible. First, the documentary evidence corroborates Mr. Mader's version of events. All of the purchase documents are signed by Kevin Burke as purchaser and none are signed by the defendant, other than the check. The handwritten note in the dealer's file shows that the vehicle was to be registered in Kevin Burke's name and that the defendant was to be listed as lienholder. A handwritten note on the dealer's checklist states that the debtor will "overnight check to us." The check for the purchase of the vehicle was dated June 20, 2006, and not May 31, 2006, and the check was processed for payment by Edd Kirby Chevrolet on June 20, 2006, not May 31, 2006. Second, the court finds it incredible that either Mr. Mader or salesman Pete Flammini would have allowed the vehicle to be titled to Kevin Burke or have allowed the defendant to be listed as the sole lienholder if they had been presented with the Capital One blank check booklet. The requirements and instructions in that booklet make it crystal clear that only the defendant could be listed as owner of the vehicle and that only Capital One could be listed as lienholder. It is highly unlikely that both Mr. Flammini and Mr. Mader of Edd Kirby Chevrolet would intentionally ignore those lender requirements and subject Edd Kirby Chevrolet to possible liability for the value of the car or the

7

amount paid by Capital One through the unauthorized use of the check. Having judged the credibility of the witnesses and considered their tangible evidence, the court credits the testimony presented by the plaintiff and rejects the testimony of the defendant.

## II.

The plaintiff seeks a determination that the obligation owed by the defendant to the plaintiff with respect to the purchase of the Chevrolet Avalanche is nondischargeable under the provisions of 11 U.S.C. § 523(a)(2) (A) which provides in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>> (2) for money, property, services, or any extension, renewal, or refinancing of credit, to the extent obtained by–
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

In order for the plaintiff to prevail in this proceeding, the evidence must establish by a preponderance that the defendant committed an act within subsection (A) against the plaintiff.

False pretenses, false representations, and fraud are usually based on a misrepresentation made by someone with intent to mislead someone else. In this case, the legal questions revolve about the concepts of misrepresentation and intent because of the unusual nature of the contractual relationship between the plaintiff and defendant. For example, at first glance it does not appear that defendant made any express misrepresentation to Capital One about her prospective use of the blank check, at least not in the sense of some signed prior agreement. She applied online

for a loan, received the booklet containing the contractual provisions between her and the plaintiff, and then used the check it contained contrary to those provisions. The question is whether she misrepresented anything. According to a line of cases from the Sixth Circuit, she did.

In his dissenting opinion in *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1086 (6th Cir. 1988), a credit card case, Judge Merritt disagreed with the majority's holding that the debt in question should be discharged because the plaintiff bank had not performed any credit check on the debtor and thus could not have relied on some misrepresentation made in the application for the card. Judge Merritt thought, instead, that the bank had simply mailed the credit card, along with a statement of its terms, to the debtor, and that no express misrepresentation was made by the debtor up to this point:

> The credit cardholder misrepresented nothing at this point. The credit cardholder made no representations, and no contract was made when the bank "issued" the card later. When the card was issued, it was accompanied by a form containing stipulations concerning the use of the card, the calculation of finance charges and the fact that the bank may terminate the credit arrangement at will. App. 74-75.
>
> The Court, like the Eleventh Circuit in *Roddenberry, supra,* reasons that the negligent bank's "unreasonable reliance" on the holder's conduct and intent takes place at the time it approves the application and issues the credit card, rather than at the time the credit card is used and the bank is required to pay the third party supplier. Since the bank assumed the risk of nonpayment by the holder, the bank's payment of the holder's purchases does not constitute reliance.
>
> This characterization is based on an incorrect analysis of the contractual relationship. When an issuer of a credit card, like MasterCard, Visa or American Express, sends to the holder the card and the form describing the terms for its use, it makes "an offer [for] . . . the formation of a number of contracts by successive acceptances from time to time," as the card is used. Restatement (Second) of Contracts § 31 (1981). "A standard example of a divisible offer is the continuing guaranty, the promise to guarantee performance of obligations of a specified type as a third party may incur to the offeree from time to time." *Id.,* Comment b. The credit card relationship, properly analyzed, should be viewed as an offer by the

> issuer to create the opportunity for a series of unilateral contracts which are actually formed when the holder uses the credit card to buy goods or services or to obtain cash.
>
> The several state courts which have analyzed the contractual relationship with care have adopted this line of reasoning. They hold that a contract is not formed when a credit card is issued but rather unilateral contracts are formed each time the card is used. *Garber v. Harris*, 104 Ill.App.3d 675, 60 Ill.Dec. 410, 412-13, 432 N.E.2d 1309, 1311-12 (1982); *Novack v. Cities Service Oil Co.*, 149 N.J.Super. 542, 374 A.2d 89 (1977); *City Stores Co. v. Henderson*, 116 Ga.App. 114, 156 S.E.2d 818, 823 (1967).
>
> No bilateral contract is formed when the card is issued, as the Court appears to suggest. Thus the questions of fraud and reliance turn on the honesty of the cardholder's intent and of the holder's representations made at the time the card is used, not when it is issued. Most bankruptcy courts which have considered this issue have adopted this same reasoning and have held that the cardholder makes an implied representation at the time he uses the card that he has the ability and intent to pay the issuing bank for his purchases. *See In re Dougherty,* 84 B.R. 653, 17 B.C.D. 590, 592 (9th Cir. BAP 1988); *In re Faulk,* 69 B.R. 743, 752 (Bankr.N.D.Ind.1986); *American Bank and Trust Co. v. Lipsey,* 41 B.R. 255 (Bankr.E.D.Pa.1984). The Court does not allude to or attempt to answer this argument.

*Id.* at 1086-87 (Merritt, J., dissenting).

The reasoning in Judge Merritt's dissent became the Sixth Circuit's rule when the court, ten years after *In re Ward*, decided *A T & T Universal Card Services, Inc. v. Rembert (In re Rembert)*, 141 F.3d 277 (6th Cir. 1998), and stated that "[t]he *use* of a credit card represents either an actual or implied intent to repay the debt incurred." *Id*. (emphasis added). It cited with approval the leading case of *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280 (9th Cir. 1996), in which the Ninth Circuit, citing Judge Merritt's dissent in *Ward* with approval, had analyzed credit card uses in terms of unilateral contract and concluded that "[w]hen the card holder uses his credit card, he makes a representation that he intends to repay the debt . . . .

When the card holder uses the card without an intent to repay, he has made a fraudulent representation to the card issuer." *Id.* at 1285.

Judge Krupansky, who wrote the majority opinion in *Ward*, also participated in deciding *Rembert*, and in his concurring opinion recognized:

> In the instant case, the majority has adopted the rationale articulated in *Anastas* and elected to recognize the kind of credit card fraud urged by the dissent and tentatively rejected by the majority in *Ward. See* Maj. op. at 281. Consequently, when Rembert engaged in each individual transaction using her cards, she necessarily and concomitantly manifested "either an actual or implied intent to repay the debt incurred." Maj. op. at 281. This acknowledgment, in itself, is not objectionable to precedent. *See Ward,* 857 F.2d at 1085 (leaving open the possibility that such a cause of action could exist).

*In re Rembert,* 141 F.3d at 283 (Krupansky, J., concurring).

The credit card cases cited above are almost exact parallels to the case at bar. In each case, a financing company issued an instrument – a credit card or blank check – with contractual conditions attached to its use. That issuance was an offer for a unilateral contract, and the usage of the instrument implied an intent on the part of the defendant to accept the offer in good faith and thereby intend, at least, to comply with the essential contractual conditions accompanying the offer. An intent not to comply with the conditions of usage, evident at the time of the usage, would amount to a misrepresentation, and that is what we have in the case at hand. The defendant misrepresented her intent to abide by the essential conditions of the offer when she intentionally misused the blank check. Capital One relied on her misrepresentation to its detriment by paying the check without receiving a first lien position and without its borrower being the titled

owner of the vehicle. It follows that Capital One has demonstrated the required elements of an action under 11 U.S.C. § 523(a)(2)(A)

### III.

For the foregoing reasons, the court will enter a separate judgment for the plaintiff.

# # #